HOOD, Judge.
This action was instituted by Thomas C. Lofton against Great American Insurance Company to recover the sum of $20,599.14, which amount allegedly was paid by Lof-ton as premiums on insurance policies issued by defendant in excess of the earned premiums due on those policies. Plaintiff also claims damages, penalties and attorney’s fees.
Judgment was rendered by the trial court in favor of plaintiff, awarding him the principal amount claimed, but rejecting his demands for damages, penalties and attorney’s fees. Defendant appealed. Plaintiff has answered the appeal demanding that the judgment be amended to allow interest from the date the insurance policies were cancelled, rather than from date of judicial demand, and that penalties and attorney’s fees be allowed.
Plaintiff is a contractor engaged in constructing electrical power lines, and his principal place of business is in Pineville, Louisiana. On or before April 26, 1962, *334 the James J. Curro Insurance Agency, of New Orleans, solicited and obtained Lof-ton’s insurance business. At that time Curro acted as agent for a number of insurance companies, one of which was defendant, Great American Insurance Company of New York. He also was authorized by Great American to execute surety bonds in its behalf, and pursuant to that authority he in fact had issued surety bonds to Lofton before he began handling any of his insurance business.
In his capacity as agent for that company, Curro caused Great American Insurance Company to issue to Lofton the following insurance policies: (1) A Comprehensive Automobile Liability Policy, (2) a Comprehensive General Liability Policy, and (3) a Workmen’s Compensation and Employer’s Liability Policy.
The automobile liability policy was issued on April 26, 1962, and the other two policies were issued on June 26, 1962. Each policy was issued for a term of one year, and each was renewed at the end of that period of time for an additional one year term. All three of these renewed policies were cancelled by the insurer, Great American, on August 3, 1963. And, at or about the same time, Great American can-celled its agency contract with Curro and it rescinded Curro’s authority to execute surety bonds in behalf of that company.
The evidence shows that prior to the time Great American cancelled the insurance policies which it had issued to Lofton, the aggregate sum of $82,537.33 was paid to the Curro Agency as premiums due on insurance policies issued to Lofton. As will be discussed more fully later, some of these payments were made by Lofton and others were made for him by Automotive Finance Company, also of New Orleans. The earned premiums on the policies which had been issued to Lofton by Great American amounted to only $61,938.19. The evidence establishes, therefore, that Curro received from Lofton or Automotive Finance $20,599.14 more than the earned premiums due on the policies which Great American had issued to Lofton. Plaintiff contends that he is entitled to recover from Great American the amount which was paid to Curro in excess of the earned premiums on the policies issued by that company.
Defendant denies that it is obligated to Lofton for the return of any excess payments. It contends that the aggregate sum of money which was paid by Lofton and Automotive as insurance premiums included a payment of $22,752.60 which was made to Curro, as agent for “Underwriters at Lloyd’s,” on an “All Risk Contractor’s Equipment” insurance policy purportedly issued by that company through the Gurro Agency. Great American takes the position that it did not issue any such policy to Lofton, that Curro did not act as Great American’s agent in issuing such a policy or in receiving the premium, that the last mentioned payment of $22,752.60 was made to Curro as agent for Lloyd’s instead of for Great American, and that Great American thus is not obligated to return any part of that 'payment to plaintiff. It is argued that since the $22,752.60 payment cannot be considered as a páyment made to Great American, the evidence shows that only $59,784.73 actually has been paid to Great American on Lofton’s account, that being less than the aggregate amount of earned premiums due that insurer.
The issue presented here, therefore, is largely factual. It centers around the question of whether the $22,752.60 payment was made to Curro as agent for Great American or as agent for some other insurer. If it was paid to him as agent for Great American, then we think defendant would be liable to plaintiff for the return of this excess payment. But, if the payment was made to Curro as agent for some other principal, then we think there would be no obligation on the part of Great American to make the reimbursement which is'claimed.
During the first part of the year 1963 Lofton, through Curro, entered into an ar *335 rangement with Automotive Finance Company under the terms of which the latter agreed to advance money to pay some of the premiums due on policies written for plaintiff by the Curro Agency, with the understanding that Lofton would pay the finance company a stipulated amount each month until the amount advanced was repaid in full. As evidence of each such transaction Automotive required that the insured execute a “Premium Contract” on a form provided by the finance company which sets out the name of the insurance company, a description of the policy, the amount of the premiums due on that policy and a schedule of the monthly payments which are to be made by the insured. The contract is of such a nature that it could be considered and treated as a promissory note. The finance company customarily held each such contract until it was paid in full, and then it marked the original contract “Paid” and returned it to the borrower. Curro kept a supply of these contract forms on hand, and the finance company customarily advanced to Curro the premiums requested when Curro would present to that company a form of contract which had been completed and signed by the insured.
On or about February 20, 1963, Curro presented to Automotive Finance Company a “Premium Contract” which purported to bear the signature of Thomas C. Lofton. The document recited that an All Risk Contractor’s Equipment policy, in the amount of $1,000,000.00, had been issued by “Lloyd’s” to Lofton on February 18, 1963. The premium due on that policy, as shown by the contract, was $25,965.65, but a down payment of $3,000.65 was listed as having been made, leaving a balance of $22,965.00 due on the premium. Under the provisions of this contract, Lofton was to repay to Automotive the balance of $22,965.00 in four monthly installments of $5841.25 each, beginning on March 20, 1963.
In connection with the same transaction Curro executed a document, designated as a “Cover Note,” dated February 18, 1963, in which Curro certified that he had procured an All Risk Contractor’s Equipment insurance policy, issued by “Underwriters at Lloyd’s,” to Thomas C. Lofton, covering a two year period beginning February 18, 1963. The evidence indicates that this cover note was presented to Automotive by Curro at the same time the premium contract was presented.
The “Premium Contract,” dated February 20, 1963, relating to the Lloyd’s policy, was proved to be a complete forgery. Lof-ton did not request any such insurance, he never received a policy of that type, he did not sign a premium contract authorizing Automotive to pay the premiums on such a policy, and he knew nothing about the premium contract to which his signature had been forged. The record does not show that any such policy was ever applied for or issued by Lloyd’s.
Automotive Finance Company, after receipt of this forged premium contract and the cover note, issued its check to Curro on February 23, 1963, for the sum of $22,752.60. The Vice President of Automotive explained that $212.40 was deducted from the amount called for in the premium contract because of a “factor shortage,” and for that reason the amount of the check issued by the finance company was a little less than the balance allegedly due as premiums on the Lloyd’s policy. Although the premium contract shows that a “down payment” of $3,000.65 was made on the Lloyd’s policy, no payment of any such sum was made by or in behalf of Lofton for any insurance premiums at or about that time.
In line with its customary procedure, Automotive kept the original premium contract in its files. Plaintiff, and the Secretary-Treasurer of his business, testified that they never saw the original contract and they did not know that it existed until some time after Great American cancelled their insurance policies. Lofton, nevertheless, proceeded to make the four monthly payments of $5,841.25 each to Automotive, *336 as called for in the contract, the last payment having been made on June 27, 1963. Upon receiving this last payment Automotive stamped the contract “Paid” as of that date, but it continued to hold the original paid contract, or note, in its files until about March 17, 1964, when Automotive mailed it to Lofton.
Defendant argues that since Lofton made all of the payments called for in the premium contract dated February 20, 1963, he must have been aware of the fact that such a contract existed and that the large premium had been paid to Curro as agent for Lloyd’s instead of as agent for Great American. The evidence shows, however, that plaintiff had been misled into believing that the $22,752.60 payment made by Automotive to Curro had been made to the latter in his capacity as agent for Great American, and that it was to be applied toward the payment of premiums due on a Great American policy.
John W. Sproles began working as “Secretary-Treasurer” for Lofton in May, 1963. He testified that at that time he found in Lofton’s files a statement or bill from Cur-ro, dated February 15, 1963, showing that Lofton was indebted to Curro for a premium on the Workmen’s Compensation policy which had been issued by Great American to Lofton on June 26, 1962. The amount of the premium shown to be due on that policy at that time was $22,965.65, that being the exact amount shown to be due on the forged premium contract which Curro presented to Automotive at about the same time. Attached to Curro’s statement in plaintiff’s file was a formal “Bill for Audit Premium Adjustment,” which had been prepared by Great American showing a premium audit for the seven month period beginning June 26, 1962, and ending January 26, 1963, on the Workmen’s Compensation policy which had been issued to Lof-ton by Great American. This seven month period audit billing showed that Lofton owed an earned premium of $22,965.65 on that Workmen’s Compensation policy at that time. The Accounting Manager of the Dallas office of Great American testified that this audit billing was prepared by Great American and that it correctly showed the audited earned premium due for that seven month period.
Sproles also found in Lofton’s file an incomplete, unsigned copy of a “premium contract” in favor of Automotive, which form of contract had been prepared for the signature of Lofton. This form of contract was identical to the premium contract dated February 20, 1963, which had been forged, except that the copy which Lofton had in his files did not make any reference at all to Lloyd’s or to the type of policy to which it related, and it did not show that a down payment of $3,000.65 had been made. The blanks on the form had been filled in enough to show that the balance due on the premium contract was $22,965.00, and that this was to be repaid by Lofton in four monthly installments of $5,841.25 each, beginning on March 20, 1963. Sproles testified that he then checked and found that the first two checks due under that unsigned agreement had already been issued, and since he had completely satis-ifed himself from Curro’s statement and from Great American’s audit billing that a premium of $22,965.00 had been paid by Automotive on the Workmen’s Compensation policy, he proceeded to issue and deliver to Automotive the remaining two checks to clear up the account.
Curro did not testify at the trial,' so we have no explanation from him as to why he engaged in these transactions. The evidence convinces us, however, that Curro submitted to Lofton a statement of the premium which was due Great American on the Workmen’s Compensation policy issued by that company. At about the same time, and for a reason which does not appear in the record, Curro also furnished to Automotive a forged premium contract, and a cover note falsely reciting that a policy had been issued to Lofton by Lloyd’s, and that a premium was due by Lofton on the Lloyd’s policy in exactly the same amount as that which was due Great American.
*337 Curro clearly was acting as agent for Great American in submitting the statement and audit billing to Lofton, and in inducing Lofton to make the payments on the premium contract. Certainly it was implied in that communication that if the payment should be made to Curro, it would be received by him as agent for Great American. On the other hand, it is apparent that Curro was acting as agent for Lloyd’s in submitting the forged premium contract to Automotive, and in receiving the payment from that finance company.
The trial judge concluded “that it would not matter, insofar as Lofton is concerned, that Automotive, as a result of deception practiced upon it by Curro, intended its payment to the latter to relate to Lloyd’s insurance when Lofton believed [in good faith] that it related to Great American insurance.” He found that Lofton was not a party to the fraudulent scheme.
We agree with the result reached by the trial court. It appears to us that the representations made by Curro to Automotive and the representations made by him to Lofton in connection with this payment of $22,752.60 are parts of one scheme or transaction. Lofton was the insured, and he is the one who ultimately had to pay the premiums due Great American. Curro represented to him that the amount was due as premiums on a Great American insurance policy, and that the payment would be accepted by him as agent for that company. In our opinion, the fact that he made a different representation to the finance company in connection with the same transaction does not have the effect'of relieving Great American of the responsibility for the acts of its agent, who acts con-formably to the power confided in him. LSA-C.C. art. 3021.
Our conclusion is that the payment of $22,752.60 made to Curro must be considered as having been made to him as agent for Great American. The evidence shows, therefore, that plaintiff has paid to Great American more than was owed by him as earned premiums, and that he is entitled to recover the excess payments. LSA-R.S. 22:636; F & H Catering Service, Inc. v. United States Fidelity & Guaranty Company, 249 La. 667, 190 So.2d 91 (1966).
The trial judge allowed plaintiff legal interest on the principal amount of the judgment from “date of judicial demand, until paid.” Plaintiff, in answering the appeal, contends that the trial court erred in failing to allow interest from August 3, 1963, that being the date on which the policies were cancelled and the refund of unearned premiums became due.
Our Civil Code provides that “All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated.” LSA-C.C. art. 1938.
LSA-R.S. 22:636 provides that the portion of the premium paid to an insurer, unearned because of cancellation of the policy, must be paid to the insured “as soon as practicable following such cancellation.” In the instant suit we conclude that the refund of unearned premiums to Lofton was a debt which became due when the policies were cancelled. We think plaintiff is entitled to recover interest on the principal amount of the judgment at the rate of five per cent per annum from August 3, 1963, until paid. The judgment will be amended accordingly.
We agree with the trial judge that the defendant was not arbitrary, capricious or without probable cause in refusing to refund the unearned premiums to Lofton. Difficult factual and legal issues are involved, and we think defendant was entitled to refuse payment until the rights of plaintiff could be determined in a judicial proceeding. We find no error in the trial court’s refusal to award penalties and attorney’s fees.
For the reasons herein set out the judg-meftt appealed from is amended to allow interest on the principal amount of the judgment at the rate of five per cent per *338 annum from August 3, 1963, until paid. In all other respects the judgment rendered by the district court is affirmed. All costs of this appeal are assessed to defendant-appellant.
Amended and affirmed.